UNITED STATES v. GOLCONDA CATTLE CO.

(District Court, D. Nevada. April 27, 1912.)

No. 1,166.

PUBLIC LANDS (§ 19*)—INCLOSURE—UNLAWFUL FENCE.

Inside an inclosure maintained by defendant cattle company were 26,-000 acres of government land and 11,000 acres of privately owned lands, nearly all of which belonged to defendant. The 11,000 acres were for the most part bottom lands, and almost completely surrounded the tract owned by the government. The tract was inclosed by a post and wire fence about 44 miles in length, none of which was on government land. There were some openings or gaps in the fence, but they were in most cases at and toward the east end of the field and were separated by long distances, so that they were not sufficient to afford reasonable and proper access to the government land. *Held*, that the inclosure as maintained was a violation of Act Cong. Feb. 25, 1885, c. 149. 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), prohibiting the inclosure of government lands by a party having no claim or color of title thereto in good faith, so as to prevent the public use thereof, and therefore should be abated as a nuisance in the absence of the opening of further gaps therein not less than 100 feet long, nor more than 1½ miles apart.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

In Equity. Suit by the United States against the Golconda Cattle Company. Decree for complainant.

Samuel Platt, U. S. Atty.

William Denman and Charles R. Lewers, for defendant.

FARRINGTON, District Judge. This suit was brought to obtain a decree abating an alleged unlawful inclosure of certain public lands in Elko county, Nev. Inside the inclosure there are some 26,000 acres of government land and 11,000 acres of privately owned lands, nearly all of which belong to defendant. The 11,000 acres are for the most part bottom lands, and almost completely surround the tract owned by the government. The bottom lands on the north and west are traversed by Tojam creek and Rock creek. The bottom lands on the south and east are traversed by Willow creek and its tributary, the Siawappe. The northeast end of the tract rests on the western slopes and foothills of Rock Creek Mountains, very near a point

where the headwaters of Tojam and Siawappe creeks are less than a mile apart. Sixteen miles to the southwest these waters come together at the junction of Rock and Willow creeks. Within the inclosure and just above the junction of the two creeks, in one body there are 2,500 of the 11,000 acres. From each end of this field extends a strip of bottom land, one up Rock creek and Tojam, and one up Willow creek and Siawappe, to the place where they join. The tract is inclosed by a post and wire fence some 44 miles in length, none of which is on government land. All of this fence except about 4 miles on Rock creek immediately above its junction with Willow creek, and a drift fence known as North's fence at the northeast corner of the tract has been constructed since 1908. About 4 miles above the junction of the two creeks, there is a short lane 150 feet in width, through which passes the public highway from Tuscarora to Midas. From this lane to the next opening in the fence up Rock creek is more than 4 miles in a direct line, and more that 5½ miles by fence. Here is an opening of 100 feet, known as opening No. 3. From this gap to the next, designated as No. 4, 100 feet in length, there are more than 4 miles. From the last opening there are 2½ miles of fence to opening "B," 50 feet long. Between this opening (B) and North's fence there are 2⅝ miles. North's fence, which forms something more than 1½ miles of the inclosure, is old, in poor repair, and down at a number of places. Between North's fence and Nelson's fence there is a gap of 1¼ miles. The country here is rough and mountainous, but not impassable for either cattle or sheep. Following Nelson's fence 1⅓ miles to the south, we come to opening "A," a gap of 300 feet. From this gap south to opening No. 6 defendant maintains a continuous fence for 4⅝ miles. Gap No. 6 is about 3,400 feet long, and is favorably and conveniently located for the passage of cattle drifting toward Rock Creek Mountains. Between openings 6 and 7 there are more than 4 miles of fence. The last is an opening of 100 feet, through which the road from Tuscarora enters the field, emerging at No. 1 on the west side. Five and three-eighths miles west of opening No. 7 is opening No. 8, 100 feet long. Following the fence from this point in a southwesterly direction down Willow creek around the southwest end of the field, and thence northeast up Rock creek, a total distance of 8 miles, we come to opening No. 1, the place of beginning. There are thus nine openings in a total fence line of more than 40 miles. The evidence shows that cattle belonging to neighboring stockmen have often grazed on the government land in question since the inclosure was made; and across it in 1910 more than 200,000 sheep were driven from southwest to northeast. The government land is all rough and hilly. It has a general slope toward the southwest, as well as an inclination from the central high land toward Willow creek on the south, and to Rock creek and Tojam creek on the north and west. It affords only a somewhat scant pasturage for about two months in the early spring.

Plaintiff contends that this is an unlawful inclosure; that defendant should be required to account for the use of the government land; that its agents, servants, and employés should be restrained from

196 F.—16

further maintaining the said fence and inclosure; and that defendant be ordered to remove and destroy the fence and inclosure at once.

The suit is brought under the provisions of Act Feb. 25, 1885, the first two sections of which read as follows:

"Section 1. That all inclosures of any public lands in any state or territory of the United States, heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure the person, party, association, or corporation making or controlling the inclosure had no claim or color of title made or acquired in good faith, or an asserted right thereto by or under claim, made in good faith with a view to entry thereof at the proper land office under the general laws of the United States at the time any such inclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, erection, construction or control of any such inclosure is hereby forbidden and prohibited. * * *

"Sec. 2. That it shall be the duty of the district attorney of the United States for the proper district * * * to institute a civil suit in the proper United States District or Circuit Court, or territorial district court, in the name of the United States, and against the parties named or described who shall be in charge of or controlling the inclosure complained of as defendants; and jurisdiction is also hereby conferred on any United States district or circuit court or territorial district court having jurisdiction over the locality where the land inclosed, or any part thereof, shall be situated, to hear and determine proceedings in equity, by writ of injunction, to restrain violations of the provisions of this act. * * * In any case if the inclosure shall be found to be unlawful, the court shall make the proper order, judgment, or decree for the destruction of the inclosure, in a summary way, unless the inclosure shall be removed by the defendant within five days after the order of the court."

There is some authority for the proposition that an incomplete inclosure is not an unlawful inclosure within the meaning of this statute. The act declares, however, that "all inclosures of any public lands" made without claim or color of title are unlawful, and the maintenance of any such inclosure is forbidden and prohibited.

The purpose of Congress was to prohibit those who were without claim or color of title from so fencing such lands as to acquire exclusive use, or prevent the common use thereof. It is not reasonable to think Congress intended it should be lawful to exclude the public from government land up to that point where such exclusion fails to be complete exclusion, and the inclosure does not amount to a complete inclosure. If the statute prohibits complete inclosure only, then a single 20-foot gap in 40 miles of fence surrounding a tract of government land would entirely eliminate any question of unlawfulness, and yet the purpose of the act would probably be as effectually defeated as if there were no gap. I cannot yield my assent to such a construction of this act. It must be interpreted with a view to effect its obvious purpose.

This rule is clearly stated by the Supreme Court in United States v. Lacher, 134 U. S. 624, 628, 10 Sup. Ct. 625, 626 (33 L. Ed. 1080):

"But, though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the Legislature. * * * 'It appears to me,' said Mr. Justice Story, in United States v. Winn, 3 Sumn. 209, 211 [Fed. Cas. No. 16,-740], 'that the proper course in all these cases is to search out and follow

the true intent of the Legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the Legislature.'"

Defendant's bottom lands are undoubtedly more valuable than the government land which they inclose. The primary purpose of the fence was to prevent cattle from following up the creeks and ranging over defendant's lands; but in the same degree that defendant's lands were thus protected the government land was rendered inaccessible to ranging cattle. The defendant has a right to fence its own lands, but it must not so exercise this right as to prevent public use of the government land. It was in recognition of this rule that defendant provided the nine openings above mentioned.

I find no evidence of any intention to violate the statute, other than the erection of the fence itself. The intent with which the inclosure is made or maintained, however, is immaterial. The existence of an inclosure such as the statute prohibits is the essential thing, and, while defendant has undoubtedly sought to keep within the law, I am satisfied that the openings on the north, west, and south are not sufficient under present conditions to afford reasonable and proper access to the land in question. Most of the gaps, particularly the long ones, are at and toward the east end of the field. Those on the west and south are insufficient under present conditions.

I therefore find the inclosure described in the bill is unlawful, and it must be abated. Proper orders will be prepared to that effect, unless defendant shall within five days after notice hereof open its fence on Rock creek and Tojam creek above opening No. 1, and on Willow creek and Siawappe creek above opening No. 8, so that there shall be at least one gap not less than 100 feet long in each 1½ miles of fence, and the consecutive gaps shall not be more than 1½ miles apart, provided that no gaps are required in the said inclosure south of openings No. 1 and No. 8. Each opening must be so located and arranged as to afford free and unobstructed ingress to and egress from said government land.